**SERVICE EMPLOYEES INTERNATIONAL UNION, AFL–CIO, CLC, Plaintiff, Appellee,**

v.

**LOCAL 1199 N.E., SEIU, AFL–CIO, CLC, Defendant, Appellant,**

**95–1471.**

United States Court of Appeals, First Circuit.

Heard Sept. 11, 1995.

Decided Nov. 21, 1995.

Larry Engelstein, Silver Spring, MD, with whom Jonathan P. Hiatt, Warren H. Pyle, and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, Boston, MA, were on briefs, for appellee.

Robert M. Gault, with whom Richard Mirabito, Susan M. Basham, Boston, MA, John M. Creane, Milford, CT, Michael E. Passero, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, and Law Firm of John M. Creane, Milford, CT, were on briefs, for appellant.

Before STAHL, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

The attempted dissolution of timeless vows of fidelity between two labor organizations gave rise to this litigation. An extremely unhappy relationship between a local union and its International led the Local to stop paying its monthly per capita taxes to the International. That in turn led the International to sue the Local in federal court in Massachusetts to collect those taxes. When the Local replied that it had no obligation to pay the taxes, the International claimed arbitration. The court ordered arbitration; the arbitrator ordered the payment of the taxes and late fees. The Local appeals from the district court's decision confirming the arbitrator's award. We affirm in part and vacate and remand in part.

The plaintiff International is the Service Employees International Union, AFL–CIO, CLC ("SEIU"), a one million member organization. The Local is District 1199, an 18,000 member union of health care employees. The Local asserts that following a *New York Times* article in the Spring of 1991 questioning the propriety of the financial dealings of certain International officials, it led a movement to promote reform within the International. These efforts, it says, were met with retribution from the International, which, in turn, caused the Local to withhold taxes. The International denies any wrongdoing or

retribution and attributes more common, self-interested motives to the Local.

### History

The International sued the Local in federal court in Massachusetts on September 17, 1993, seeking a preliminary injunction requiring the Local to pay per capita taxes which it had withheld since October 1992. Six days later, in federal court in Connecticut, certain individual members of the Local sued both the Local itself and the International for rescission of the contract between the two on the grounds that the contract was entered into without fully informing the members or receiving their authorization. This, the Connecticut suit claimed, contravened the bylaws and constitution governing the Local as well as the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, et seq.[1]

The Massachusetts court denied the Local's motion to transfer the action to Connecticut. It also denied the International's motion for a preliminary injunction, but granted the International's motion to compel arbitration. The district court denied both the Local's motions to stay proceedings and to dismiss and the International's motions to enjoin the Local from proceeding with its cross-claim in Connecticut and for entry of default. The district court later denied the Local's motion to reconsider, vacate and reassign for reargument the motion to compel arbitration. The Local, however, went to arbitration voluntarily. The parties agreed upon the six questions to be put to the arbitrator.[2]

Before arbitration commenced, on January 19, 1994, the Executive Board of the Local unanimously voted to terminate its contract with the International.

After seven days of hearings, the arbitrator issued an initial decision that: (i) the Local was liable to the International for per capita taxes; (ii) the Local did not have the right to terminate its contract (the "Affiliation Agreement") with the International, except through the procedure set forth within the International's Constitution and Bylaws, and (iii) the Local's purported disaffiliation vote of January 19, 1994 violated the Affiliation Agreement and was rescinded. The Arbitrator reserved decision on various remedial issues, including payment schedule, late fees, auditor's access to data, and priority of paying per capita obligations, in order to give the parties a chance to reach a negotiated resolution.

Negotiations on remedial matters failed, according to the Local, because the International preconditioned any compromise on the Local securing the withdrawal of the Connecticut lawsuit. The Local argued to the arbitrator that such preconditioning was an unlawful burden on the "right to sue" guaranteed to union members by the LMRDA. The arbitrator, however, refused to consider the issue, since it related to a separate law-

---

1. Motions in the Connecticut case, *O'Neil et al. v. New England Health Care Employees Union, District 1199, and SEIU*, No. 3:93CV1918 (JAC) (D.Conn.), were under advisement at the time of oral argument in this case.

2. The Local and the International stipulated that the six questions to be addressed by the arbitrator were:
1. Does the failure of District 1199 NE to remit to the SEIU the monthly per capita tax, as set forth in Article 10 of the Affiliation Agreement, constitute a violation of the Affiliation Agreement, and if so, what shall be the remedy?
2. Does the failure of District 1199 NE to pay to the SEIU the late penalty fee as required under Art II, Sec. 3 of the SEIU constitution and bylaws constitute a violation of the Affiliation Agreement, and if so, what shall be the remedy?
3. Does the failure of District 1199 NE to pay its full per capita tax obligations to the SEIU before paying any other bills, as required under Art XII, Sec. 4 of the SEIU constitution and bylaws, constitute a violation of the Affiliation Agreement, and if so, what shall be the remedy?
4. Does the failure of District 1199 NE to furnish to an auditor designated by the International President to examine its books and record all of its books, records, accounts, receipts, vouchers, and financial data as requested, as required under Art XII, Sec. 6(a) of the SEIU constitution and bylaws, constitute a violation of the Affiliation Agreement, and if so, what shall be the remedy?
5. Does the District have the right to terminate the 1992 Affiliation Agreement, and if so, under what circumstances?
6. Does the District's purported termination on or about January 19, 1994, violate the 1992 Affiliation Agreement, and if so, what shall be the remedy?

suit that was not before him. On November 9, 1994 the arbitrator awarded the International unpaid taxes, late fees, and all other ancillary relief.[3] Post-arbitration, the International moved to confirm the arbitrator's award, and the Local moved to vacate it. The district court granted the International's motion to confirm.

The Local has appealed, making three arguments. The Local argues that the arbitrator exceeded his authority by rescinding the vote of the Local's Executive Board and ordering payment of the outstanding per capita taxes, saying these remedies were not authorized by the Affiliation Agreement. The Local also urges that confirmation of the arbitrator's award violated public policy in that the award undermined both the free speech rights of union members to be critical of the International and to institute legal proceedings against it. The Local finally argues that the district court erred in granting the International's motion to compel arbitration and in denying both the Local's motion to stay proceedings and its motion to transfer the case to Connecticut.

*Confirmation of the Arbitrator's Award*

■ This Court reviews the district court's confirmation of the arbitrator's award *de novo* as to questions of law and mixed questions of law and fact, and for clear error as to questions of fact. *See First Options of Chicago, Inc. v. Kaplan,* —— U.S. ——, ——, 115 S.Ct. 1920, 1926, 131 L.Ed.2d 985 (1995). Federal court review of arbitral decisions on matters of contract interpretation is extremely narrow and extraordinarily deferential. *See Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica Local 610,* 959 F.2d 2, 3–4 (1st Cir.1992); *El Dorado Technical Servs., Inc. v. Union General de Trabajadores,* 961 F.2d 317, 319 (1st Cir.1992) ("[A] court should uphold an award that depends on an arbitrator's interpretation of a collective bargaining agreement if it can find, within the four corners of the agree-

ment, any plausible basis for that interpretation.").

■ The Local argues that this case should be treated as a commercial contract dispute between two entities and not as a labor dispute under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. This, the Local posits, would permit less deference to the arbitrator. Indeed, it appears it would not. This Court in *Advest, Inc. v. McCarthy,* 914 F.2d 6 (1st Cir.1990) explained, after reviewing different articulations of the standard of review of an arbitrator's award in both labor and commercial cases, that the different formulations were in essence "identical." *See id.* at 8–9; *see also Hill v. Norfolk W. Ry. Co.,* 814 F.2d 1192, 1195 (7th Cir.1987). Without deciding the larger question, we decline in this dispute between two unions to vary from the deferential treatment of arbitration awards established by the Supreme Court in labor disputes under the *United Steelworkers* trilogy of cases. *See United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596–97, 80 S.Ct. 1358, 1360–61, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

The Local argues that the arbitrator exceeded his authority by imposing remedies he was not authorized to impose. It concentrates its force on the arbitrator's ruling that the disaffiliation vote was contrary to the Affiliation Agreement and his award rescinding the vote. It also attacks the order that it pay the due per capita taxes and late fees that had accrued.

The arbitrator interpreted the Affiliation Agreement to disallow disaffiliation except by the methods set forth in the International's Constitution and Bylaws.[4] Those methods do not include disaffiliation by a vote of a

---

3. The total amount of unpaid dues and late fees (calculated at the rate of 2% per month, compounded) was approximately $2,000,000 ($1,500,000 in unpaid dues and $500,000 in late fees).

4. In the Affiliation Agreement the International explicitly waived, for the Local, a number of the requirements of its Constitution and Bylaws, but did not waive the requirements of Article XXIV, the dissolution provision.

local union's executive board. The only method of disaffiliation allowed by the International's Constitution and Bylaws imposes onerous requirements. The article entitled "Dissolution" states that no local union "can dissolve, secede or disaffiliate while there are seven (7) dissenting members...." Further, the Affiliation Agreement is of indefinite duration.

■ The Local argues that the arbitrator's award contradicts the autonomy it had explicitly negotiated for in the Affiliation Agreement. Whether or not we might have read the contract differently, or have sympathy for the plight of the Local that now finds itself unable to disaffiliate from the International with whom it has, at best, a badly strained relationship, the arbitrator's reading of the Affiliation Agreement is plausible and we cannot disturb it. In the face of evidence that affiliation negotiations had been lengthy, with the Local negotiating a number of specific protective provisions in the Affiliation Agreement (such as bars on the power of the International to impose a trusteeship, a merger, or a forfeiture of assets in the event of a dissolution), it was plausible to conclude, as the arbitrator did, that the Local bound itself to a contract of unlimited duration that allowed only a tiny escape hatch.[5]

■ The Local also erroneously argues that because this case involves a contract dispute, the arbitrator was only authorized to award damages and nothing else for breach of contract. Specific performance is a recognized remedy for a breach of contract, and because that remedy was not expressly precluded by the Affiliation Agreement, it was plausible for the arbitrator to award it. "[S]ubject to the terms of the empowering clause, arbitrators possess latitude in crafting remedies as wide as that which they possess in deciding cases." *Advest*, 914 F.2d at 10–11.

■ The Local argues that the arbitrator's award exceeded his authority in that requiring a payment of the per capita taxes plus a penalty was not among the specific remedies listed in the International's Constitution and Bylaws for non-payment of dues. The remedies explicitly listed are suspension of the local union, revocation of the local union's charter, and appointment of a trustee. The arbitrator, however, plausibly rejected an interpretation that these were exclusive remedies. The relevant section of the International's Constitution and Bylaws does not limit the International's remedies to the three enumerated. Rather, the relevant clause refers the matter of non-payment of dues to the International President for such action as he shall deem appropriate, "including *without limitation*" the three actions specifically listed (emphasis added).

### Alleged Violations of Public Policy

■ The Local argues that the arbitrator's award must be set aside in any event because it is contrary to public policy that is explicit, well-defined and dominant. *See, e.g., W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). That policy, it says, is contained in the LMRDA, §§ 101(a)(2), (4), and the protections it guarantees to union members to be able to express freely their views and opinions, and to institute proceedings in court or in front of an administrative agency. When a violation of well-defined and dominant public policy is asserted, the question is ultimately one for resolution by the courts, and a court is required to make its own independent evaluation. *See id.*

■ The Local makes two very precise arguments.[6] First, it says, the award con-

---

5. The Local also points to cases mentioning "autonomy" as a factor in determining a local union's right to terminate its affiliation agreement. Those cases, however, turn, as does this one, on the terms of the local union's agreement with the international. *See, e.g., Local No. 1, Amalgamated Lithographers v. Brown*, 26 A.D.2d 90, 270 N.Y.S.2d 891, 896 (1966), *aff'd*, 20 N.Y.2d 962, 286 N.Y.S.2d 853, 233 N.E.2d 856 (1967); *Sand-*

ers v. De Lucia, 266 F.Supp. 852, 856 (S.D.N.Y. 1967), *aff'd*, 379 F.2d 550 (2d Cir.1967).

6. For the first time on appeal, the Local also argues that the arbitrator's reading of the Affiliation Agreement's preconditions to disaffiliation violates public policy. It is settled that "absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot

dones violation of free speech rights in ignoring that the International "repeatedly and systematically retaliated against the District for engaging in union democracy activities." As an example, the Local points to the fact that the International President, John Sweeney, did not include the Local's representative on his slate of candidates for election to the executive board of the International (which would, according to the Local, have guaranteed the election of its candidate). The Local cites in support of its argument cases involving situations in which the union officials whose rights under the LMRDA were endangered had *won* elections and were being removed or suspended *during* their terms. *See Maceira v. Pagan,* 649 F.2d 8, 10–11 (1st Cir.1981); *Bradford v. Textile Workers,* 563 F.2d 1138, 1139–40 (4th Cir. 1977). Although a plausible argument might be made for extending those cases beyond their facts, the arbitrator found as a matter of fact that no promise to slate the Local's candidate for the International's board elections had been made as a part of the Affiliation Agreement, and that refusal to do so was not in retaliation for the Local's "union democracy" activities. We may not second guess the factual findings of the arbitrator. *See Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In *Misco,* the Supreme Court counselled that it is "the arbitrator's view of the facts ... that [the parties have] agreed to accept" and that "[c]ourts thus do not sit to hear claims of factual ... error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Id.* at 37–38, 108 S.Ct. at 370. The factual predicate for the Local's argument was explicitly found wanting by the arbitrator. Absent such a factual predicate, we may not reach the legal claims.

The Local next argues that the arbitrator's award violates LMRDA § 101(a)(4), which provides as follows:

> Protection of right to sue.—No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding
> ...

29 U.S.C. § 411(a)(4).

During the negotiations mandated by the arbitrator, the International, according to the Local, refused to negotiate over a reduction in or a reasonable repayment schedule for the per capita taxes or a waiver of the late fees, unless the Local arranged for the withdrawal of the *O'Neil* lawsuit that its members had brought in Connecticut. The Local argues that the International, by conditioning negotiations on the Local securing the withdrawal of its members' lawsuit, violated the "right to sue" guaranteed to union members by LMRDA § 101(a)(4).

The arbitrator refused to consider the issue of whether the International had violated the "right to sue" of the Local's members. He said that the *O'Neil* lawsuit was not before him. The legal question, however, has nothing to do with the *O'Neil* litigation itself. Instead, the issue is whether the International, in refusing to do other than extract its maximum recovery unless the Local secured the withdrawal of its members' lawsuit, violated the members' "right to sue." [7]

---

*be broached for the first time on appeal." Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co.,* 953 F.2d 17, 21 (1st Cir.1992).

**7.** There is clear evidence in the form of correspondence between the International and the Local showing the International's unwillingness to waive or reduce the payments owed, unless the *O'Neil* lawsuit was withdrawn. The arbitrator, however, made no findings on whether this was so and on the issue of whether conditioning negotiations on the Local securing withdrawal of a member's lawsuit constituted an interference with a member's "right to sue."

In addition, an issue mentioned in passing, but not squarely argued by the International, is whether this Court may consider the evidence of the International's conduct during settlement negotiations. But issues not squarely raised by the parties are waived. *See Grella v. Salem Five Cent Savings Bank,* 42 F.3d 26, 36 (1st Cir.1994) (argument raised by way of "cursory footnote" deemed waived). There is much law, in any event, to support admissibility. *See NLRB v. Gotham Indus., Inc.,* 406 F.2d 1306, 1313 (1st Cir.1969) (statements made during the course of a labor negotiation that are the basis for a charge of unfair labor practices are admissible on the trial of that issue); *see also Urico v. Parnell Oil*

654

Two distinct issues are presented: payment of the per capita taxes and payment of the late fee.

■ The per capita taxes paid by the local unions are the means by which the International funds its existence. The Local makes no claim that the per capita taxes are usually waived, reduced, or rescheduled. Since the per capita taxes are payments that the International expects to collect in full as a matter of course, the failure to negotiate over reducing or rescheduling them cannot on these facts be said to be a "penalty" on the "right to sue."

■ The late fee is a different matter. The 2% a month late fee is at a rate many states consider usurious.[8] When compounded monthly, the annual rate works out to 26.82% a year and adds up here to $500,000—approximately a third of the actual principal payment. Further, the evidence is that late fees are routinely waived by the International, and even when assessed, the fees are typically small.[9] In the context of the high rate charged and the routine waiver of late fees in other cases, conditioning a waiver on the Local securing withdrawal of its members' lawsuit may be a deterrent to members suing. "If a union member's right to sue is to have any meaning, courts must be ever vigilant in protecting that right against indirect and subtle devices as well as against direct and obvious limitations." *Phillips v. International Ass'n of Bridge Workers, Local 118*, 556 F.2d 939, 942 (9th

Cir.1977); *see also Moore v. Local 569 of Int'l Bhd. of Elec. Workers*, 53 F.3d 1054, 1056 (9th Cir.1995) ("The employee bill of rights protection is worded in the most inclusive terms, which are clearly intended to preclude restraints upon members' rights to seek relief from courts and agencies."), *petition for cert. filed*, 64 U.S.L.W. 3271 (Sep. 20, 1995). If enforcement of the late fee portion of the arbitrator's award was in retaliation for the filing of the *O'Neil* lawsuit, that would arguably violate § 101(a)(4)'s prohibition against a union obstructing the right of its members to sue. The arbitrator failed to conduct any factfinding on this issue. Hence we vacate the award of late fees and remand this issue to the district court to send back to the arbitrator for factfinding and decision. *See Labor Relations Div. of Constr. Industries v. International Bhd. of Teamsters, Local No. 379*, 29 F.3d 742, 749 (1st Cir.1994) (case involving fact-intensive factor balancing remanded to district court with instructions that it be remanded to the arbitrator for initial determination).

The International argues that there was no penalty on the members' right to sue because in this case, the late fees were imposed *before* the *O'Neil* suit was brought. The International's distinction, however, is evanescent. It is not the imposition of the late fees that is at issue, but the *subsequent* refusal to grant a waiver of those late fees as the International usually has done, unless the suit was withdrawn.[10]

Co., 708 F.2d 852, 854 (1st Cir.1983) (evidence of settlement negotiations is admissible to show that a wrongful refusal to make a reasonable settlement offer prevented the plaintiffs from being able to mitigate damages); *Overseas Motors, Inc. v. Import Motors Ltd.*, 375 F.Supp. 499, 537 (E.D.Mich.1974) ("[I]t would also seem reasonable to admit such evidence where the settlement negotiations are themselves subjects of the lawsuit—i.e., operative facts."), *aff'd*, 519 F.2d 119 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

8. For example, the rate above which interest charges constitute usury in Massachusetts is 20%. *See* Mass.Gen.L. ch. 271, § 49; *Begelfer v. Najarian*, 381 Mass. 177, 182, 409 N.E.2d 167 (1980); *see also* Eric A. Posner, *Contract Law in the Welfare State: A Defense of the Unconscionability Doctrine, Usury Laws, and Related Limitations on the Freedom To Contract*, 24 J.Legal

Stud. 283, 313 (1995) (presenting a short history of the development of usury laws).

9. Evidence pointed to by the International itself, to show how it regularly assesses and collects late fees, shows that other than in this case, all the late fees it has assessed have been for amounts lower than $1,000.

10. The International also argues that § 101(a)(4) protects the rights of "members" to sue, and that that right does not extend to the Local as an organization. The Local, however, is not asserting its own right to sue, but that of its members. The Local appears to meet the three-pronged test for associational standing set out in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). *See International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Brock*, 477 U.S. 274, 282, 106 S.Ct.

*Rulings on Motions*

The Local argues that the district court erred in granting the International's motion to compel arbitration and in not granting both the Local's motion to have the case transferred to Connecticut for consolidation with the *O'Neil* case and its motion to stay the Massachusetts action.

■ There was no error in compelling the Local to arbitration. To the extent that the Local is arguing that there was no need to order it to arbitration as it would go voluntarily, the district court could reasonably think an order necessary in light of the motion to enjoin arbitration filed by the Local in the Connecticut action.

■ The district court's rulings on the motions to transfer and stay are reviewed for an abuse of discretion. *See Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987); *Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 578 (7th Cir.1995). The district court did not abuse its discretion in denying the Local's motions to transfer the action or to stay it. The Massachusetts suit dealt with the distinct issue of the parties' conduct under the Affiliation Agreement. The Connecticut action dealt with the separate issue of whether the Local's members needed to have ratified the Affiliation Agreement. In the interests of dealing with matters before it in a timely manner, the district court denied the stay, and was well within its bounds in doing so.

*Accordingly, the late fee portion of the award is vacated and remanded to the district court to be remanded to the arbitrator. The district court's judgment is affirmed in all other respects. The International's motion for sanctions against the Local, for filing a frivolous appeal, is denied. No costs are awarded.*

---

2523, 2528–29, 91 L.Ed.2d 228 (1986) (holding that union has standing to assert rights of members where *Hunt* test is satisfied); *United States v. Local 560 (I.B.T.)*, 974 F.2d 315, 339–42 (3d Cir.1992) (applying the test of organizational standing to sue to the case of a Local asserting the rights of its members under the LMRDA); *see also American Postal Workers Union v. M. Frank*, 968 F.2d 1373, 1375 (1st Cir.1992).