USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-2142 WHEELABRATOR ENVIROTECH OPERATING SERVICES INCORPORATED, Plaintiff, Appellee, v. MASSACHUSETTS LABORERS DISTRICT COUNCIL LOCAL 1144 AND LABORERS INTERNATIONAL UNION OF NORTH AMERICA, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________ ____________________ Before Stahl, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ Ira Sills with whom Segal, Roitman & Coleman was on brief for _________ _________________________ appellant. Benjamin B. Culp, Jr., with whom Steven M. Bernstein, Fisher & ______________________ ____________________ ________ Phillips, Bradford J. Smith and Goodwin, Procter & Hoar, were on brief ________ _________________ _______________________ for appellee. ___________________ July 10, 1996 ____________________ 1 STAHL, Circuit Judge. This appeal involves a STAHL, Circuit Judge. ______________ 2 challenge to a district court's grant of summary judgment 1 vacating an arbitration award. Massachusetts Laborers 2 District Council, Local 1144, ("the Union") seeks 3 reinstatement of an arbitrator's ruling that Wheelabrator 4 Envirotech Operating Services, Inc., breached its collective 5 bargaining agreement with the Union by failing to compel its 6 successor to assume the agreement. Because we hold that the 7 arbitrator plausibly construed the collective bargaining 8 agreement, we vacate the district court's ruling and direct 9 the district court to enter judgment confirming the 10 arbitration award. 11 I. I. __ 12 Background Background __________ 13 A. Relevant Facts __________________ 14 On October 16, 1980, Envirotech Operating Services, 15 Inc., ("EOS") entered into a contract with the City of 16 Taunton, Massachusetts, ("the City") to take over the 17 operation of the City's waste water treatment plant ("the 18 plant").1 The parties amended this contract in 1982, 19 renegotiated it in 1985, and amended it again in 1989. The 20 City ultimately allowed this operational contract with the 21 EOS to expire on June 30, 1992. As a condition of its  ____________________ 22 1. Baker International owned EOS in 1980 when it initially 23 contracted with the City to operate the plant. Baker 24 International subsequently sold EOS to Waste Management 25 International. Ultimately, Wheelabrator acquired EOS several 26 years later and formed the appellee, Wheelabrator Envirotech 27 Operating Systems, Inc. -3- 3 1 initial agreement with the City, EOS hired a significant 2 number of the City's employees who were then working at the 3 plant. EOS also agreed to recognize the Union as the 4 exclusive bargaining representative for its employees at the 5 plant and to assume the City's collective bargaining 6 agreement with the Union.  7 Following the expiration in 1982 of this initial 8 bargaining agreement (which EOS had assumed), EOS and the 9 Union agreed to the first in a series of collective 10 bargaining agreements, each lasting three years in duration. 11 The parties negotiated the collective bargaining agreement 12 that is the subject of this appeal (the "CBA") in 1989 and it 13 expired on May 31, 1993, eleven months after the expiration 14 of EOS's operational contract with the City. Each of the 15 three-year agreements contained an identical "successor 16 clause" that provided: 17 In the event the operation of the plant, 18 in whole or in part, is assumed by any 19 other entity, public or private, the 20 successor organization . . . shall agree 21 to all terms and conditions of this 22 Agreement unless that assumption in whole 23 or in part would be in violation of legal 24 rights and obligations of the affected 25 employees of the successor organization. 26 In March 1992 -- prior to the expiration of EOS's 27 contract with the City -- the City solicited proposals to 28 operate the plant. EOS and three other companies submitted 29 bids. The City did not require the bidders to agree to -4- 4 1 assume the EOS-Union CBA. On June 23, 1992, the City 2 announced that Operations Management International ("OMI") 3 had submitted the winning bid and would assume the operation 4 of the plant effective July 1, 1992. Subsequently, OMI hired 5 a substantial number of employees who had worked for EOS and 6 recognized the Union as the bargaining representative of its 7 employees. OMI, however, refused to assume the EOS-Union 8 CBA. 9 At a city council meeting on June 30, 1992, EOS 10 implored the City to reconsider its decision to award the 11 contract to OMI. The City declined. During the meeting, OMI 12 confirmed that it did not intend to assume the EOS-Union CBA. 13 B. The Arbitrator's Award __________________________ 14 On June 30, 1992, the Union filed a grievance 15 against EOS under the procedure outlined in the CBA, alleging 16 that EOS had breached the CBA by failing to secure OMI's 17 assumption of the CBA. EOS responded that it had no such 18 obligation because, inter alia, the successor clause did not _____ ____ 19 apply to a situation in which, as here, no privity existed 20 between EOS and the entity assuming the operation of the 21 plant. On February 24, 1993, an arbitration hearing was 22 convened to resolve the dispute. 23 Following the hearing, the arbitrator concluded (1) 24 that the language of the successor clause was ambiguous; (2) 25 that the parties intended the clause to require EOS to -5- 5 1 obligate all successors, even those with which it had no 2 privity, to assume the terms and conditions of the CBA; and 3 (3) that EOS had failed to make any effort to fulfill that 4 obligation with respect to OMI. As a remedy, the arbitrator  5 ordered EOS to make whole its former employees who began 6 working for OMI in July 1992 for all losses in wages, fringe 7 benefits, and other conditions incurred as a result of OMI's 8 failure to assume the CBA. The arbitrator further ordered 9 the parties to offset against the award the value of any 10 relevant benefits agreed to by OMI in its negotiations with 11 the Union or any payments resulting from the settlement of 12 the Union's related grievance against the City. 13 The Union's grievance against the City focused on 14 the City's failure to obligate OMI to assume the CBA. The 15 City settled the grievance and agreed to pay all former EOS 16 employees the difference between what OMI pays the employees 17 and the amount the employees would have received under the 18 EOS-Union CBA. The City, however, did not agree to 19 compensate the employees for the loss of vacation time and 20 other fringe benefits. 21 C. The District Court's Order ______________________________ 22 Following arbitration, EOS brought this action in 23 federal district court seeking to vacate the arbitrator's 24 award. EOS moved for summary judgment arguing, inter alia, _____ ____ 25 that the arbitrator had not plausibly construed the CBA. The -6- 6 1 Union also moved for summary judgment to confirm the award. 2 In ruling on the cross-motions, the district court upheld the 3 arbitrator's interpretation of the successor clause. 4 Although the court admitted that, as a matter of first 5 impression, it likely would have interpreted the successor 6 clause as applying only to subsequent employers with which 7 EOS had privity, it nonetheless found the arbitrator's 8 interpretation of the clause plausibly based on the language 9 of the CBA. In so holding, the court noted that the 10 arbitrator's interpretation found some support in the Supreme 11 Court's opinion in NLRB v. Burns Int'l Sec. Servs., Inc., 406 ____ _____________________________ 12 U.S. 272 (1972). In Burns, the Court implicitly held that a _____ 13 prevailing competitive bidder that hired a substantial 14 complement of the prior employer's workers could be 15 considered a "successor employer" for certain purposes. Id. ___ 16 at 277-81. 17 The court nonetheless vacated the award, ruling 18 that the arbitrator failed to consider whether EOS could 19 possibly perform its obligations under the successor clause. 20 The court reasoned that the clause was unenforceable because, 21 due to the lack of privity, EOS had no ability to compel OMI 22 to assume the CBA. In short, the district court held that, 23 in failing to consider EOS's inability to perform, the 24 arbitrator manifestly ignored the law of contracts and, 25 instead, pursued an outcome that reflected the arbitrator's -7- 7 1 own "personal notions of industrial justice." The Union now 2 appeals. -8- 8 1 II. II. ___ 2 Standard of Review Standard of Review __________________ 3 We review de novo a district court's decision to __ ____ 4 grant summary judgment vacating an arbitrator's decision. 5 See Labor Relations Div. of Const. Indus. of Mass., Inc. v. ___ ______________________________________________________ 6 International Bhd. of Teamsters, Local No. 379, 29 F.3d 742, ______________________________________________ 7 745 (1st Cir. 1994). In so doing, we are not bound by the 8 district court's rationale but may affirm the ruling on any 9 independently sufficient ground. Carreiro v. Rhodes Gill & ________ _____________ 10 Co., 68 F.3d 1443, 1446 (1st Cir. 1995). ___ 11 Review of arbitral decisions, however, is extremely 12 narrow and exceedingly deferential. Service Employees Int'l _______________________ 13 Union v. Local 1199 N.E., SEIU, 70 F.3d 647, 651 (1st Cir. _____ _____________________ 14 1995) (citing Dorado Beach Hotel Corp. v. Union de ____________________________ _________ 15 Trabajadores de la Industria Gastronomica, Local 610, 959 ________________________________________________________ 16 F.2d 2, 3-4 (1st Cir. 1992)); Maine Cent. R.R. Co. v. ______________________ 17 Brotherhood of Maintenance of Way Employees, 873 F.2d 425, _____________________________________________ 18 428 (1st Cir. 1989) ("Judicial review of an arbitration award 19 is among the narrowest known in the law."). In general, a 20 court reviewing an arbitral decision does "not sit to hear 21 claims of factual or legal error as an appellate court does 22 in reviewing decisions of lower courts." United Paperworkers ___________________ 23 Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). ____________ ____________ 24 Essentially, a reviewing court should refrain from 25 intervening in all but the most limited circumstances, those -9- 9 1 in which the challenger can establish that the arbitrator's 2 award is "(1) unfounded in reason and fact; (2) based on 3 reasoning so palpably faulty that no judge, or group of 4 judges, ever could conceivably have made such a ruling; or 5 (3) mistakenly based on a crucial assumption that is 6 concededly a non-fact." Advest, Inc. v. McCarthy, 914 F.2d ____________ ________ 7 6, 8-9 (1st Cir. 1990) (citations omitted); see also ___ ____ 8 Bettencourt v. Boston Edison Co., 560 F.2d 1045, 1050 (1st ___________ __________________ 9 Cir. 1977). 10 Specifically, as in this case, when the arbitration 11 concerns the interpretation of a collective bargaining 12 agreement, a court should uphold the view of the arbitrator 13 so long as "it can find, within the four corners of the 14 agreement, any plausible basis for that interpretation." El __ 15 Dorado Technical Servs. v. Union Gen. de Trabajadores de ________________________ _______________________________ 16 Puerto Rico, 961 F.2d 317, 319 (1st Cir. 1992). In other ___________ 17 words, an arbitrator may not ignore the plain language of the 18 agreement, but a court need only be convinced that the 19 arbitrator's reading "'draws its essence from the collective 20 bargaining agreement'" and does not merely rely on the 21 arbitrator's own notions of "`industrial justice.'" Misco, _____ 22 484 U.S. at 36 (quoting United Steelworkers of Am. v. _____________________________ 23 Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960)). In ____________________________ 24 fine, we should refuse to set aside an arbitrator's decision 25 "unless it can be shown that the arbitrator acted in a way -10- 10 1 for which neither party could [possibly] have bargained."  2 Local 1145, United Food & Commercial Workers Int'l Union v. __________________________________________________________ 3 Stop & Shop Cos., 776 F.2d 19, 21 (1st Cir. 1985) (citing _________________ 4 Enterprise Wheel, 363 U.S. at 599). ________________ 5 III. III. ____ 6 Analysis Analysis ________ 7 We divide our analysis into two parts. First, we 8 consider whether the district court erroneously vacated the 9 arbitration award on the basis that the arbitrator improperly 10 failed to consider EOS's inability to compel OMI to assume 11 the CBA. Finding the Union's argument persuasive on that 12 point, we then independently review whether the arbitrator 13 plausibly interpreted the phrase "successor organization" as 14 properly applying to OMI, an entity with which EOS does not 15 have privity.  16 A. Impossibility of Performance ________________________________ 17 The Union challenges the district court's 18 conclusion that the arbitrator "manifestly disregarded the 19 law of contracts" by failing to excuse EOS's performance 20 under the doctrine of impossibility.2 The Union argues 21 that, given the court's finding that the arbitrator plausibly  ____________________ 22 2. In Advest, 914 F.2d at 9, we recognized the "manifest ______ 23 disregard" standard as an alternate, though equally 24 deferential, mode of review applicable to arbitral decisions. 25 We explained that, under this formulation, review "embraces 26 instances where it is clear from the record that the 27 arbitrator recognized the applicable law--and then ignored 28 it." Id.  ___ -11- 11 1 interpreted the successor clause as obligating EOS to assure 2 that OMI would assume the CBA, the impossibility doctrine 3 does not apply to this case. We agree. 4 Essentially, the district court held (and EOS 5 contends) that the arbitrator fundamentally erred in failing 6 to recognize that, because EOS exercised no control over OMI 7 or the City, performance of its obligations under the 8 successor clause was impossible. While it may be true that 9 EOS could not possibly have compelled OMI to assume the CBA, 10 that fact, however, is not determinative as to whether the 11 arbitrator should have excused EOS's nonperformance. Excuse 12 under the contract doctrine of impossibility depends not 13 simply on whether performance has become substantially 14 impossible, but also on whether or not the parties reasonably 15 foresaw and allocated the risk that the event or 16 circumstances making performance impossible might occur. 17 See, e.g., Chase Precast Corp. v. John J. Panessa Co., 566 ___ ____ ___________________ ____________________ 18 N.E.2d 603, 606 (Mass. 1991) ("The principal question . . . 19 remains whether an unanticipated circumstance, the risk of 20 which should not fairly be thrown on the promisor, has made 21 performance vitally different from what was reasonably to be 22 expected."); see also E. Allan Farnsworth, Contracts 9.6, ___ ____ _________ 23 at 715 (2d ed. 1990) ("If a party expressly undertakes to 24 perform, even though performance becomes impracticable [or 25 impossible], impracticability [or impossibility] will not -12- 12 1 excuse performance, and the party will be liable for damages 2 for nonperformance."). Parties can plausibly assume the 3 risks of events occurring where they know they will not be 4 able to complete specific performance, but will be able to 5 pay damages. The rationale justifying excuse arises only 6 when an unexpected or non-bargained-for event makes 7 performance so vitally different from that which the parties 8 originally contemplated, that the change in performance can 9 be said effectively to have vitiated the consent of the 10 parties. 11 In this case, once it is assumed that the parties 12 intended the successor clause to apply whether or not privity 13 existed between EOS and its successor, any impossibility 14 argument must fail. If, as the arbitrator found, EOS and the 15 Union intended and contemplated that the successor clause 16 would obligate EOS to assure that any successor would assume 17 the CBA, EOS cannot now complain that performance of that 18 obligation is impossible. In other words, by agreeing to 19 include the successor clause, EOS accepted and bargained for 20 the risk that, if it lost the contract, it would effectively 21 guarantee that its "successor" would assume the terms and 22 conditions of the CBA. As long as EOS clearly foresaw and 23 bargained with the knowledge that it could lose the contract 24 -- something we must assume if the arbitrator plausibly 25 interpreted the successor clause -- the fact that performance -13- 13 1 might be impossible if EOS indeed lost the contract is of no 2 moment. 3 In the alternative, EOS argues that the district 4 court correctly vacated the arbitration award because EOS's 5 failure to perform under the successor clause did not cause 6 the Union's injuries. EOS reasons that the arbitrator held 7 that EOS had breached the successor clause, not because it 8 had failed to compel OMI to assume the CBA, but, instead, 9 because EOS did not even try. Thus, EOS concludes, the 10 arbitrator interpreted the successor clause as imposing on 11 EOS only the duty to make a good faith effort to compel OMI 12 to assume the CBA. EOS then reasons that, because it had no 13 power or leverage to bind OMI (or the City), any attempt to 14 do so would have been futile. In other words, because EOS 15 did not have control over OMI, it could not have persuaded or 16 compelled OMI to assume the CBA and, thus, the Union would 17 have suffered injury whether or not EOS had "performed" under 18 the successor clause (i.e., tried to compel OMI to assume the ____ 19 CBA). Therefore, EOS contends, its breach of the successor 20 clause did not cause any damage to the Union.  21 Though this reasoning has some force, EOS 22 constructs it (as did the district court) on a false premise. 23 Specifically, EOS reads the arbitrator's interpretation of 24 the duties imposed by the successor clause too narrowly. 25 That the arbitrator recounted EOS's failure even to try to -14- 14 1 obligate OMI as evidence that EOS breached the successor 2 clause does not necessarily mean that, had EOS attempted but 3 failed to obligate OMI, the arbitrator would have found that 4 EOS had satisfactorily performed. To the contrary, the 5 arbitrator expressly stated in the arbitration award "that 6 the intent of the successor clause was an obligation on the 7 predecessor to obligate the successor to assume all terms and ________ 8 conditions of the [CBA]." (Emphasis added.) This 9 unequivocal statement calls for more from EOS than simply a 10 good faith, but unsuccessful, attempt to obligate OMI. 11 Indeed, the fact that the arbitrator awarded damages confirms 12 that the arbitrator read the successor clause as imposing a 13 duty on EOS to succeed in obligating its successor, not 14 simply a duty to try. If not, one would have to conclude 15 that the arbitrator irrationally awarded damages for injuries 16 to the Union that were not causally linked to EOS's failure 17 to perform, and we have found no compelling reason to reach 18 such a conclusion. At bottom, we view the arbitrator's 19 reference to EOS's failure even to try to persuade OMI as, at 20 most, a rhetorical flourish, simply emphasizing the extent of 21 EOS's breach (i.e., not only did EOS fail to compel OMI to ____ 22 assume the CBA, it did not even try).  23 In sum, the district court erroneously vacated the 24 arbitration award on the grounds that EOS could not possibly 25 perform its obligations under the successor clause. -15- 15 1 B. Successor Clause ____________________ 2 As noted, much of our analysis so far relies on the 3 assumption that the arbitrator permissibly interpreted the 4 successor clause as requiring EOS to assure that OMI would 5 assume the CBA. While we acknowledge that the district court 6 ruled favorably to the Union on this point, we are not bound 7 by its holding and may independently review the arbitrator's 8 decision on this issue. See Carreiro, 68 F.3d at 1446. ___ ________ 9 Because the issue strikes us as quite close, we now turn to 10 consider it, using de novo review. See Labor Relations, 29 __ ____ ___ ________________ 11 F.3d at 745. In so doing, we consider first whether the 12 arbitrator's interpretation is consistent with the plain 13 language of the CBA, and, second whether, on the facts of 14 this case, the arbitrator's interpretation is one for which 15 the parties could possibly have bargained. As we have 16 stated, our ultimate task is limited to determining only 17 whether the arbitrator's interpretation of the successor 18 clause "draws its essence from the collective bargaining 19 agreement" and does not merely reflect the arbitrator's own 20 notions of "industrial justice." Misco, 484 U.S. at 36 _____ 21 (internal quotations omitted). 1. The Plain Language of the ______________________________ 22 CBA ___ 23 We begin with the text. In relevant part, the 24 successor clause provides:  25 In the event the operation of the plant, 26 in whole or in part, is assumed by any -16- 16 1 other entity, public or private, the 2 successor organization . . . shall agree 3 to all terms and conditions of this 4 Agreement. .  5 We agree with the district court that the 6 arbitrator's interpretation is not inconsistent with the 7 plain language of the successor clause. First, following its 8 successful bid, OMI clearly became an "entity" that had 9 "assumed" the operation of the plant. Next, while one could 10 arguably read the phrase "successor organization" as 11 importing a further restriction on the type of entities 12 covered by the clause (e.g., only those entities in privity ____ 13 with the predecessor), we do not think the text compels that 14 interpretation. To the contrary, we think one could 15 permissibly read the text "any other entity" that has 16 "assumed" "the operation of the plant" as defining the scope 17 of the phrase "successor organization." Thus, because OMI is 18 an "entity" that has "assumed" the operation of the plant, 19 the arbitrator's conclusion that OMI is a "successor" is 20 consistent with the language of the clause. Cf. Howard ___ ______ 21 Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & ___________ _____________________________________________ 22 Restaurant Employees Int'l Union, 417 U.S. 249, 262 n.9 __________________________________ 23 (1974) ("There is, and can be, no single definition of 24 'successor' which is applicable in every legal context."). 25 Furthermore, as the district court noted, this 26 reading gathers at least some support from the Supreme 27 Court's decision in Burns. In Burns, the Court effectively _____ _____ -17- 17 1 held that an entity like OMI -- a prevailing competitive 2 bidder that had hired a substantial complement of its 3 predecessor's employees -- was a "successor employer," see ___ 4 Burns, 406 U.S. at 296 (Rehnquist, Burger, Brennan, Powell, _____ 5 JJ., dissenting, describing majority opinion as implicitly 6 premised on the successorship doctrine), and required it to 7 recognize and bargain collectively with the union 8 representing those employees, id. at 277-81. Thus, the ___ 9 application of the term "successor" to an entity that has no 10 direct connection or link to the original employer, i.e., no ____ 11 privity, has some precedent in labor case law. See also NLRB ___ ____ ____ 12 v. Houston Bldg. Serv., Inc., 936 F.2d 178, 180-81 (5th Cir. _________________________ 13 1991) (subsequent employer who successfully bids for a 14 contract is a "successor employer" with a duty to bargain 15 with union), cert. denied, 502 U.S. 1090 (1992); Systems _____ ______ _______ 16 Mgmt. v. NLRB, 901 F.2d 297, 301-05 (3d Cir. 1990) (similar); _____ ____ 17 cf. Howard Johnson, 417 U.S. at 262 n.9 ("A new employer ___ ______________ 18 . . . may be a successor for some purposes and not for 19 others."). 20 Notably in Burns, however, the Court did not _____ 21 require the "successor employer" in that case to assume the 22 obligations of the collective bargaining agreement between 23 its predecessor and the union. 406 U.S. at 286. Indeed, the 24 Court declined to do so principally because a complete lack 25 of privity existed between the successor employer and its -18- 18 1 predecessor. Id. Arguably, such reasoning supports EOS's ___ 2 position that the successor clause in this case should be 3 read narrowly as obligating EOS to require only those 4 "successors" with which it has privity to assume the CBA. 5 Nevertheless, we do not think the reasoning compels such a 6 reading. In Burns, the Court analyzed only the obligations _____ 7 of a successor employer arising generally from the National 8 Labor Relations Act. The Court did not, however, focus on 9 the issue addressed here: whether the parties to a 10 collective bargaining agreement could agree to bind a 11 predecessor employer to obligate even a successor with which 12 it lacks privity to assume the terms and conditions of the 13 agreement.  14 In sum, we agree that the arbitrator's conclusion 15 that OMI is a successor employer is not inconsistent with the 16 plain language of the CBA. 17 2. The Arbitrator's Own Notions of Industrial ___________________________________________________ 18 Justice _______ 19 Notwithstanding our conclusion that the 20 arbitrator's interpretation fits within the text of the 21 successor clause, we decline to end our analysis at this 22 juncture. Instead, we proceed to consider whether, in the 23 context of this case, the arbitrator's interpretation does 24 not merely reflect the arbitrator's own notions of industrial 25 justice. In other words, we consider whether, on the facts -19- 19 1 presented here, the parties could possibly have agreed that 2 the successor clause obligated EOS to assure that even 3 "privity-less" successors, like OMI, would assume the CBA. 4 See Stop & Shop, 776 F.2d at 21 (a court should uphold the ___ ____________ 5 arbitrator's interpretation "unless it can be shown that the 6 arbitrator acted in a way for which neither party could 7 [possibly] have bargained").  8 In so doing, we agree that it is arguably doubtful __ 9 that EOS and the Union could possibly have intended the 10 successor clause to apply in this case, if to have done so 11 necessarily required the parties to read the clause as 12 imposing an obligation on EOS that would both (1) be 13 impossible to perform and (2) expose EOS to a risk of 14 substantial loss for nonperformance. Therefore, we will now 15 consider whether acceptance of the arbitrator's 16 interpretation necessarily requires us to conclude, as EOS 17 contends we must conclude, that the parties read the clause 18 as imposing an impossible obligation on EOS that exposed it 19 to a risk of substantial loss.  20 a. Perception that performance is impossible _____________________________________________ 21 If we accept the arbitrator's interpretation, EOS 22 contends that the parties would have understood the successor 23 clause as burdening EOS with an impossible obligation because 24 they would have recognized that EOS lacked the ability to 25 gain leverage over the City or any successor with which it -20- 20 1 was not in privity. Thus, EOS would not be able to compel 2 such a successor (or compel the City to require such a 3 successor) to assume the CBA. While the Union concedes this 4 is true with respect to a successor like OMI, it argues that, 5 with respect to the City, the facts before the arbitrator 6 belie the assertion. First, the Union notes that, as part of 7 the City's initial contract with EOS, the City required EOS 8 to assume its collective bargaining agreement with the Union. 9 This suggests, the Union contends, that the City (or at least 10 EOS might have perceived that the City) would have viewed 11 sympathetically a request to impose a similar condition on 12 any future successors. The Union further points out that, 13 when EOS amended and renegotiated its contract with the City, 14 it could have bargained with the City to include in future 15 bid solicitations a requirement that all bidders agree to 16 assume any then existing bargaining agreement between EOS and 17 the Union. The Union also argues that the fact the City has 18 agreed to pay Union members their lost wages following OMI's 19 failure to assume the CBA further suggests that the City 20 would have recognized that it had some obligation to consider 21 the welfare of its former employees.  22 Though not overly persuasive, these arguments do 23 indeed tend to support the Union's position. EOS responds by 24 pointing out that, in fact, it was unable to persuade the 25 City to require OMI to assume the CBA. However, nothing in -21- 21 1 the record suggests that EOS ever attempted to persuade the 2 City to impose such a condition before the June 30, 1992, 3 council meeting, which occurred after the City had awarded 4 the contract to OMI. EOS's inability to persuade the City to 5 impose the condition on OMI in 1992 does not foreclose the 6 inference that EOS may have believed that it could convince 7 the City to impose the condition when EOS originally agreed 8 with the Union to include the successor clause. Moreover, 9 even if EOS perceived that it might not be able to perusade 10 the City to obligate its successor to assume the CBA, EOS 11 could well have assumed the risk of having to pay damages in 12 that situation.  13 In sum, we do not think that, in accepting the 14 arbitrator's interpretation, we must conclude that the 15 parties necessarily intended to impose an impossible 16 condition on EOS. b. Perception of risk of substantial ____________________________________ 17 loss ____ 18 Nor do we believe that the parties necessarily 19 perceived the clause as exposing EOS to a risk of substantial 20 loss. While the arbitrator's interpretation of the clause 21 does effectively make EOS the guarantor of its employees' 22 salaries and fringe benefits in the event it loses its 23 contract with the City, we do not agree that EOS must have 24 viewed the risk associated with that guarantee as so 25 substantial that it never would have agreed to bear it. -22- 22 1 First, the risk was temporally limited. EOS knew that the 2 clause posed a significant risk only for the period of time 3 that the CBA survived EOS's contract with the City, i.e., ____ 4 eleven months. Second, EOS also knew that, under Burns, any _____ 5 successor employer that assumed the operation of the plant 6 and hired a "substantial complement" of EOS's employees would 7 likely be required to recognize the Union and engage in 8 collective bargaining. Hence, if that occurred, EOS's 9 potential liability was limited to the extent that any future 10 agreement between the Union and EOS's successor would be less 11 favorable to the Union than the current CBA. Arguably, if 12 EOS believed it had achieved the best deal possible under the 13 current CBA, it would not have believed that a successor, 14 required to bargain with the Union, would be able to reach a 15 significantly better deal. Finally, EOS would have perceived 16 the risk as substantial only to the extent that it believed 17 that the City would not require a successor employer to 18 assume the CBA or that an arbitrator would enforce the 19 obligation against it. 20 In sum, as with the argument that the parties must 21 have perceived the successor clause as imposing an impossible 22 obligation, we do not think that, in accepting the 23 arbitrator's interpretation, we must conclude that the 24 parties perceived the clause as exposing EOS to a significant 25 risk of substantial loss. Though as a matter of first -23- 23 1 impression we might well have decided this case otherwise, 2 given our standard of deference and the ambiguity of 3 contractual language, we cannot say the arbitrator's reading 4 of the successor clause merely reflects the arbitrator's own 5 notions of industrial justice. It is neither inconsistent 6 with the text, nor so improbable that we are convinced that 7 "the arbitrator acted in a way for which neither party could 8 [possibly] have bargained." Stop & Shop, 776 F.2d at 21.3 ___________ 9 IV. IV. ___ 10 Conclusion Conclusion __________ 11 For the foregoing reasons, we vacate the district 12 court's grant of summary judgment, and order the court to 13 enter judgment in favor of the Union, confirming the 14 arbitration award.  ____________________ 15 3. We also note that the arbitrator found, as a matter of 16 fact, that, in adopting the successor clause, EOS and the 17 Union shared the understanding that the clause bound EOS to 18 compel all successors, even those with which it did not have 19 privity, to assume the CBA. In making this finding, the 20 arbitrator specifically credited and relied on testimony to 21 that effect given by a Union representative who had 22 participated in the negotiations of the initial collective 23 bargaining agreement between the Union and EOS. See Misco, ___ _____ 24 484 U.S. at 37-38 ("Courts do not sit to hear claims of 25 factual and legal error" because it is "the arbitrator's view 26 of the facts and meaning of the contract that [the parties 27 have] agreed to accept."); Service Employees Int'l, 70 F.3d ________________________ 28 at 653.  -24- 24